UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

KATIE L. FOIX,

          Plaintiff,                  Civil No. 07-2978 JNE/FLN

v.                        **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

          Defendant.
_____

          Edward C. Olson, Esq., for Plaintiff.
          Lonnie F. Bryan, Assistant United States Attorney, for Defendant.
_____

FRANKLIN L. NOEL, United States Magistrate Judge.

      Plaintiff Katie L. Foix seeks judicial review of the final decision of the

Commissioner of Social Security, who denied her applications for disability benefits

("DIB") and social security income ("SSI").  See 42 U.S.C. § 1382(c).  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter was referred to the undersigned

for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  The

parties have submitted cross-motions for summary judgment (Docket Nos. 8 and 11).

For the reasons which follow, this Court recommends the Commissioner's decision be

reversed and remanded for additional proceedings.

## I.  INTRODUCTION

Ms. Foix was injured in an automobile accident in January 1981, when she was two-and-a-half years old.  (Tr. 148, 186).  In the accident, she suffered a head injury, which resulted in developmental difficulties.  (Tr. 148, 186).  She received special education services in school (in the form of an "IEP.") (Tr. 100).  See Ind. School Dist. No. 283, v. S.D. by J.D., 88 F.3d 556, 558 (8th Cir. 1996) (defining IEP "[u]nder IDEA an IEP "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.") (quoting Honig v. Doe, 484 U.S. 305, 311 (1988)).  Ms. Foix graduated from high school in 1998.  (Tr.  81, 100).

## II.  STATEMENT OF FACTS

*1.  Plaintiff's Background*

Ms. Foix was twenty-eight years old on the date of the ALJ's decision.  (Tr. 284). She does not have any past relevant work because all of her recent jobs were under the monetary level to be considered substantial gainful activity.  (Tr. 14).  Although she does not have "past relevant work," she does have a history of part-time employment. Ms. Foix worked part-time in fast food restaurants from November 1994 through November 1996, April 1999 through December 1999, and for one month in 2001.  (Tr. 95).  She worked part-time in a bingo hall from August 1998 through December 1999. (Tr. 95).  From June 2002 through May 2003, she worked an assembly job.  At the time of the hearing, she was working part-time as a dietary-aid, but she needed coping aids

to perform her job duties.  (Tr. 279, 288-89).

*2.  Procedural Background*

Ms. Foix filed applications for DIB and SSI on July 8, 2004, with an alleged onset

date of January 11, 1981.  (Tr. 70, 256).  Her applications were denied initially and upon

reconsideration.  (Tr. 39-43, 45-47).  Ms. Foix requested a hearing before an

Administrative Law Judge.  (Tr. 29-30).  A hearing was held before Administrative Law

Judge Roger W. Thomas on September 22, 2006.  (Tr. 269).  On November 21, 2006,

the ALJ issued a decision that was unfavorable to Ms. Foix.  (Tr. 9-21).

Upon applying his factual determinations to the evaluation sequence required by

Social Security Administration regulations, the ALJ concluded that: 1) the claimant

meets the insured status requirements of the Social Security Act through September 30,

2008; 2) the claimant has not engaged in substantial gainful activity since January 11,

1981, the alleged onset date; 3) the claimant has a severe impairment of traumatic brain

injury with cognitive dysfunction; 4) the claimant's impairment does not meet or

medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1; 5) the claimant has the residual functional capacity for work that is visual

and provides hands-on demonstrations, rather than oral or written instructions, with

tasks that focus on manipulating tangible materials, rather than auditory and written

material.  The claimant is able to perform a small number of brief, simple, repetitive

tasks, each of which consists of a fixed sequence of steps.  The claimant is able to work

in a structured, consistent work environment with few distractions and interruptions and

low stress; 6) the claimant is currently twenty-eight years old, a younger individual; 7)

the claimant has at least a high school education and is able to communicate in English;

3

8) the claimant does not have any past relevant work; 9) there are jobs that exist in significant numbers in the national economy that the claimant can perform; 10) the claimant has not been under a disability, as defined in the Social Security Act, from January 11, 1981 through the date of this decision.  (Tr. 19-21).

The Social Security Administration Appeals Council denied a request for further review by notice dated May 8, 2007.  (Tr. 4-6).  The denial of review made the ALJ's findings the final decision of the defendant.  42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992).  Ms. Foix initiated review of this action by filing a Complaint on June 20, 2007 (Docket No. 1).  It is now before the Court on cross-motions for summary judgment.  (Docket Nos. 8, 11).

*3. Medical Evidence*

On March 17 and April 1, 1993, when Ms. Foix was fourteen years old, she underwent a neuropsychological evaluation to assess her cognitive abilities related to a traumatic brain injury she suffered.  (Tr. 148).  By history, Ms. Foix displayed attentional difficulties and some delay in higher level skills, which resulted in her repeating the first grade.  (Tr. 148).  She had undergone a previous cognitive evaluation in 1986, which revealed her overall functioning in the low average intellectual level, with better performance on nonverbal, manipulative tasks, and her distractibility and difficulties with problem-solving skills.  (Tr. 148).

Upon evaluation in March 1993, Ms. Foix was cooperative and invested appropriate effort in completing the tasks requested of her.  (Tr. 148).  She achieved a full scale IQ score of 92 on the Wechsler Intelligence Scale for Children.  (Tr. 152).  She received a verbal IQ score of 89 and a performance IQ score of 96.  (Tr. 152).  This

placed her functioning within the low to mid average range of intelligence, consistent with the results of testing in 1986.  (Tr. 152).  The discrepancy in her verbal versus her performance scores appeared to reflect a superiority for perceptual organization skills in comparison with verbal comprehension.  (Tr. 152).  Similarly, Ms. Foix displayed markedly superior visual memory in comparison with verbal memory.  (Tr. 152).  She also showed a high rate of forgetting, but this was noted to be more of a function of attentional deficits in comparison to verbal or visual memory.  (Tr. 153).

Ms. Foix experienced great difficulty with complex and abstract problem-solving tasks.  (Tr. 153).  This was due to her impulsive response style and her concrete approach to tasks.  (Tr. 153).  Dr. Wolfe opined that Ms. Foix would perform the best in settings where she is actively involved in experiential learning, with the opportunity to manipulate learning materials.  (Tr. 153).  She would have difficulty attending to verbally presented material, recalling verbal material, and integrating previously learned information in novel ways.  (Tr. 153).  She would perform better if distractions were reduced.  (Tr. 153).  Her difficulty in organizing and structuring problem-solving strategies could be reduced by modeling tasks to be performed, allowing practice under supervision, and teaching generalization from one task to another.  (Tr. 153-54).

In March 2002, Ms. Foix was treated with Flexeril for left upper extremity radiculopathy.  (Tr. 168).  There was no atrophy, weakness, numbness, tingling, or loss of range of motion.  (Tr. 168).

In January 2003, Ms. Foix was treated for left wrist pain, which she attributed to labeling 400-500 boxes in a day.  (Tr. 167).  Dr. Patricia Grahek diagnosed De Quervain's tenosynovitis and mild wrist tendonitis.  (Tr. 167).  Ms. Foix was given a

5

thumb splint, and a high dose of ibuprofen, with instructions to ice and rest, and limit flexion and extension of the wrist.  (Tr. 167).

In follow-up on January 30, 2003, Ms. Foix indicated her wrist was 50 percent better.  (Tr. 165).  She was continued on the same restrictions and diagnosed with overuse injury of the wrist.  (Tr. 165).  Dr. Mark Wagner began to phase out her work restrictions in February 2003.  (Tr. 163-64).

On August 16, 2004, and continuing on September 2, 2004, Ms. Foix underwent a psychological evaluation at the request of the Social Security Disability Determination Services.  (Tr. 175).  At the time of the evaluation, she was a twenty-five-year-old single mother of one.  (Tr. 175).  Ms. Foix reported that she was on welfare and had been going to ODC employment training.  She reported that she is unable to learn or memorize lists of activities, but she can drive a car because she visually compensates for her memory problems.  Ms. Foix noted that when she gets tired, she has problems with her balance and becomes clumsy.  (Tr. 175).  She reported applying for disability because she could not get hired for a job that would pay enough to support her and her son.

Ms. Foix reported that she worked for McDonald's for three years, beginning at age sixteen.  (Tr. 175).  She had difficulty with processing orders and using the cash register.  (Tr. 176).  She was a manager at Dairy Queen for a few months when she was a senior in high school, but could not continue in this position because she had problems sorting out recipes.  (Tr. 176).  She also worked in assembly for eleven months, but quit because she had tendonitis in her wrist.  (Tr. 176).

Ms. Foix reported that she becomes more forgetful and clumsy when she is

stressed.  (Tr. 176).  She has a difficult time relaxing.  (Tr. 176).  Ms. Foix also reported

that she took a class in hunter's safety and it was easy for her because it involved visual

learning.  (Tr. 176).  She reported that she has had problems with people taking

advantage of her, and her memory problems make her vulnerable.  (Tr. 176).

As part of the evaluation, Ms. Foix discussed her level of daily functioning.  (Tr.

177).  Her interests include sewing, canning, cooking, and pet care.  (Tr. 177).  On a

typical day, she takes care of a pet, does laundry, and mows the lawn.  (Tr. 177).  She

uses sticky notes to recall jobs she needs to take care of.  (Tr. 177).  She has forgotten

plans she made with her mother.  (Tr. 177).  She gets easily distracted.  Her mother

helps her remember to do some things, and helps her with child care at times.  (Tr.

177).

Ms. Foix was cooperative and persistent.  (Tr. 177).  She had no difficulty

responding, and appeared to relate well to authority.  (Tr. 177).  Upon mental status

examination, her thought content was devoid of thought disorder, her mood was normal,

and she had no signs of depression or anxiety.  (Tr. 178).

Ms. Foix completed the WAIS-III with good effort, and the test results were likely

valid.  (Tr. 178).  She achieved a full scale IQ score of 103, a verbal IQ score of 98, and

a performance IQ score of 110.  (Tr. 178).  She also completed the Wechsler Memory

Scale-III, with index scores ranging from the 12th through the 50th percentile.  (Tr. 179).

The lowest scores were in Primary Index Immediate Memory and Auditory Memory

tests.  (Tr. 179).

The evaluator, Jeff Tonnstra, M.S., L.P., diagnosed cognitive disorder NOS, with

a GAF score of 55.  (Tr. 180).  He opined:

> Ms. Foix appears to have the mental capacity to understand but has difficulty remembering or following instructions. Has difficulty with distractibility, which affects her attention and concentration. When able to maintain attention and focus is able to carry on work like task with reasonable persistence and pace. Appears to reasonably respond to brief and superficial contact with co-workers and supervisors. She appears capable of tolerating stress and pressure found in typical entry level work places however if her stress level increases it is likely that she would increase her problem with her memory functioning. It is recommended that the previous recommendations from the neuropsychological evaluation completed when she was age 14 be followed in terms of helping her maintain an environment that reduces the chance of distraction and related memory difficulties occurring.

(Tr. 180).

Ms. Foix was treated for depression and anxiety on September 16, 2004. (Tr. 184). She was dizzy and fatigued. She is a single parent and had been working thirty-five hours a week raking leaves. She was crying and upset. Dr. Grahek recommended a day or two off work. (Tr. 184). Several days later, she was given a work restriction to cut down her hours. (Tr. 183).

Ms. Foix underwent a neuropsychological evaluation on September 14 and 21, 2004, at the Polinsky Medical Rehabilitation Center. (Tr. 186-190). In the clinical interview, Ms. Foix was alert, oriented, and cooperative. (Tr. 186). She reported being stressed, easily overwhelmed and moody. (Tr. 186). During testing she was noted to be highly distractible, even in a low distraction setting. (Tr. 187). Nevertheless, she was motivated and put forth a good effort. (Tr. 187). She needed directions repeated, and she was often careless, impulsive, and off task. (Tr. 187).

Dr. Gregory Murrey noted that Ms. Foix achieved a full scale IQ score well within

the average range of functioning, although she showed weakness in verbal abilities. (Tr. 189).  She showed intact abilities to perform simple problem solving, speech language functions, word fluency and object naming, speed of information processing, auditory processing, visual attention, mental flexibility, and mental efficiency.  (Tr. 190). Her memory function was inconsistent, especially in short-term recall of novel information.  (Tr. 190).  Dr. Murrey also noted that Ms. Foix endorsed a significant amount of depressive symptoms and level of distress.  (Tr. 190).

Dr. Murrey opined that the profile achieved from testing was consistent with that of someone with longstanding cognitive, academic, and mood difficulties associated with remote brain injury.  (Tr. 190).  He diagnosed status-post closed head injury by history, mild cognitive disorder in select areas of cognitive functioning, and mood disorder secondary to a medical condition.  (Tr. 190).  He referred Ms. Foix to a rehabilitation psychologist for supportive therapy and cognitive retraining.  (Tr. 190).

After conducting the evaluation, Dr. Murrey wrote a letter "to whom it may concern" indicating that Ms. Foix has select weaknesses in certain areas of memory that would likely have an effect on her functioning in a work environment.  (Tr. 227).  He also indicated that Ms. Foix has a reduced ability to handle high stress situations and is at risk of mood disorder.  (Tr. 227).

On October 10, 2004, Dr. Ray Conroe, a state agency reviewing psychologist, completed a Residual Functional Capacity Assessment ("RFC"), based on his review of Ms. Foix's records.  (Tr. 191-195).  He concluded that Ms. Foix would be moderately limited in the following work-related abilities: 1) ability to understand and remember detailed instructions; 2) ability to carry out detailed instructions; 3) ability to maintain

9

attention and concentration for extended periods; 4) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 5) ability to interact appropriately with the general public; 6) ability to accept instructions and respond appropriately to criticism from supervisors; 7) ability to respond appropriately to changes in the work setting.  (Tr. 191-92).  Dr. Conroe opined that Ms. Foix would not be significantly limited in any other work-related ability.  (Tr. 191-92).

Dr. Conroe also completed a Psychiatric Technique Review Form ("PTRF").  He determined that Ms. Foix has an organic mental disorder under Listing 12.02.  (Tr. 202). He opined this disorder mildly restricts Ms. Foix's activities of daily living, and causes moderate difficulties in social functioning and in maintaining concentration, persistence or pace.  (Tr. 212).  He did not find any episodes of decompensation.

On March 16, 2005, Dr. Mark Wagner completed a Medical Opinion form on Ms. Foix's behalf.  (Tr. 222).  He diagnosed Ms. Foix with cognitive dysfunction and opined that she will never likely tolerate complex psychosocial stressors.  (Tr. 222).  He opined that she has the ability to perform limited employment restricted to simple tasks with low physical and emotional stressors.  (Tr. 222).  He opined that she is able to work twenty hours a week.  (Tr. 224).

Ms. Foix was seen for an initial interview for neurorehabilitation on April 4, 2005 at the Polinsky Center, followed by eight treatment sessions.  (Tr. 220).  Mary McHardy, her treating psychologist, made the following discharge notes.  Ms. Foix had concerns with her daily challenges including child-rearing, keeping up with household tasks, and difficulties in a new work experience.  Ms. Foix met her treatment goals of improved

10

communication skills and improved adaptive coping skills.  (Tr. 220-21).

Ms. McHardy, completed a Medical Opinion Re: Ability to Do Work-Related Activities (Mental) form on Ms. Foix's behalf.  (Tr. 218-19).  The form contained a checklist concerning mental abilities and aptitude to do unskilled, semi-skilled and skilled work, and aptitudes needed to do certain jobs.  (Tr. 218-19).  Ms. McHardy defined her responses on the checklist as follows: 1) unlimited or very good means the ability to function with no problems; 2) good means the ability to function with little problems; 3) fair means the ability to function with a lot of problems; and 4) poor or none means no ability to function at all.

Ms. McHardy indicated that Ms. Foix has no ability to do the following activities related to unskilled work: carry out very short and simple instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods over time; accept instructions and respond appropriately to criticism from supervisors when that criticism is negative; respond appropriately to changes in a routine work setting.  Ms. McHardy noted that these findings are supported by "neuropsych assessment and treatment observation." (Tr. 219).  She also noted the following clinical findings: distractability, difficulty with change, easily overwhelmed, attention problems, multi-tasking, slow processing speed, fatigues easily, low tolerance for stress/frustration.  (Tr. 219).

Ms. McHardy indicated that Ms. Foix would have a fair ability to do the following activities related to unskilled work: remember work-like procedures; understand and remember very short and simple instructions (depending on distractions); maintain

11

attention for a two-hour segment with distractions; work in coordination with or proximity to others without being unduly distracted (rated between good and fair); perform at a consistent pace without an unreasonable number and length of rest periods (rated fair to poor with decreasing ability over time); accept instructions and respond appropriately to criticism from supervisors when criticism is respectful; deal with normal work stress. (Tr. 218-19).

Ms. McHardy rated Ms. Foix's abilities as good or very good for the following unskilled work activities: ask simple questions or request assistance; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; make simple work-related decisions; sustain an ordinary routine without special supervision; maintain regular attendance and be punctual.  (Tr. 218-19).  With respect to Ms. Foix's abilities to do semi-skilled to skilled work, Ms. McHardy rated her as follows: set realistic goals or make plans independently of others, very good; deal with stress of semiskilled and skilled work, fair; and understand, remember and carry out detailed instructions, poor or none.  (Tr. 219).  She rated Ms. Foix's abilities to do particular types of jobs as follows: maintain socially appropriate behavior, very good; interact appropriately with the general public, good; adhere to basic standards of neatness and cleanliness, good; and travel in an unfamiliar place (with written directions), good.

Ms. McHardy supplemented her Medical Opinion form with a narrative.  She wrote:

> Ms. Foix has difficulty in experiencing changing from her routine.  Particular challenges include multi-tasking, shifted attention, distractibility, and organization/sequencing.  How

12

others communicate with her is also essential, with helpful
feedback more conducive versus a critical manner of
feedback.  Fatigue is also a variable, with decreased
coordination the result.  When Ms. Foix is over stressed or
has too much to do, her tolerance is lowered, and she may
become physically ill.  She does need to ensure that she has
adequate rest breaks, and that physically she pace herself
comfortably.  Regarding specific work tasks, when setting
tables, she may confuse the order of things, or when
persons that she is serving change food orders, she will
have memory difficulties.  Additional challenges include
remembering items that she needs to follow through on the
next day.  When having to do a lot of job tasks at one time,
she is more likely to make mistakes.  When staff or residents
interrupt her, she is more likely to forget information that she
is needing to process or recall.  Doing unfamiliar/new tasks
can result in confusion, with Ms. Foix doing best in reverting
to her old way of doing things.  She does need more time
and does experience difficulty when having to learn things
that are new or novel.

(Tr. 217).

On May 8, 2006, Ms. McHardy wrote a letter describing the adaptive strategies

that would be required for Ms. Foix to do her best in a work environment.  (Tr. 216).

First, she noted Ms. Foix needs daily structure and routine, with ample time to learn and

process new procedures.  Second, Ms. Foix needs things written down, preferably a

checklist with all tasks in sequence.  Third, Ms. Foix needs extra time to complete tasks,

without extra tasks being added.  Fourth, "[f]atigue is a huge area of challenge for

persons with brain injury."  Ms. Foix needs adequate rest breaks.  Fifth, persons with

brain injury have trouble multi-tasking.  She needs to do one task at a time, minimizing

distractions, and not shifting attention between various activities.  (Tr. 216).

4.  *Medical Expert's Testimony*

Dr. Steven Carter testified as a medical expert at Ms. Foix's hearing before the

ALJ on September 22, 2006.  (Tr. 294).   Dr. Carter noted that there was insufficient

evidence to establish the A criteria to indicate that Ms. Foix has an organic mental

disorder, as defined in Listing 12.02.  (Tr. 295).  He explained that Ms. Foix's test results

wouldn't support the Listing, but there is contrary evidence from Ms. Foix and her

mother that her functioning is worse than would be anticipated from her test results.  (Tr.

294-95).

Dr. Carter testified that Ms. Foix doesn't have any restrictions on her activities of

daily living.  (Tr. 296).  She also doesn't have any restrictions on social functioning.  (Tr.

296-97).  She usually has mild restrictions on maintaining concentration, persistence,

and pace, but those restrictions become marked if she is asked to multi-task or work in

a highly distracting environment.  (Tr. 297).  Dr. Carter reviewed the test scores in Ms.

Foix's records.  (Tr. 297-99).  He opined that the test scores were low, but not in an

impairment range.  (Tr. 300).  He pointed out that Ms. Foix and her mother have

indicated that she performs much worse than her test scores would indicate.  (Tr. 300).

Dr. Carter was asked what limitations he would place on Ms. Foix in the work

setting.  (Tr. 300).  He responded:

> She needs visual and hands-on teaching, demonstrations
> rather than oral or written instructions.  She needs job tasks
> that focus on manipulating tangible materials rather than
> auditory and written material.  She needs a small number of
> brief, simple, repetitive tasks, each of which consists of a
> fixed sequence of steps.  She needs few distractions and
> interruptions while performing those tasks.  She needs a
> structured consistent work environment, and she needs low
> stress.

(Tr. 301).  Dr. Carter testified that he read the opinions of various medical professionals

regarding Ms. Foix's functional limitations, and although his testimony agreed with some

14

of those limitations and not others, he noted that he had the benefit of viewing the totality of the evidence and would not change his testimony.  (Tr. 304-05).

5. *Vocational Expert's Testimony*

Mr. Edward Utities testified as a Vocational Expert ("VE") at the hearing.  (Tr. 301).  The ALJ asked him a hypothetical question regarding the existence of jobs available to a person of Ms. Foix's age and education given the following impairments and limitations: traumatic brain injury at age two-and-a-half; possible kidney problems; left wrist tendonitis; left shoulder pain; needs tasks that are more visual in nature and can be shown to her by hands-on demonstration; needs to work with tangible and not auditory material; tasks should be small, brief, and repetitive, with few distractions and interruptions at work; work should be structured, consistent, and low stress.  (Tr. 306-07).

Mr. Utities testified that there are many assembly, wrapping, and packing occupations consistent with the hypothetical, but in some of these jobs, there would be another employee working ten to twenty feet away, which might be a distraction.  The only other distractions would be coming or going to pick up supplies.  (Tr. 308-09).

Then the ALJ asked the vocational expert to consider the limitations set forth in Exhibit 10F, the limitations set forth by Dr. Mark Wagner.  (Tr. 309, 222).  Mr. Utities testified that such a person could perform the same jobs he had described, but it would have to be clarified what Dr. Wagner meant by low physical and emotional stressors. (Tr. 310).  Mr. Utities also testified that it was hard to interpret Dr. Murrey's comments in Exhibit 11F, and he did not identify any jobs such a person could perform.  (Tr. 310, 227).

Finally, the ALJ asked Mr. Utities to consider Exhibit 9F, the Medical Opinion to Do Work-Related Activities (Mental).  (Tr. 311, 216-221).  Mr. Utities testified that such a person would not be able to work competitively.  (Tr. 312).

In response to questioning by Ms. Foix's counsel, Mr. Utities agreed that the limitations provided by Dr. Carter sounded like a sheltered work environment, but there are some competitive jobs that fall into Dr. Carter's description.  (Tr. 312-13).  Mr. Utities clarified his testimony concerning the types of distractions in wrapping and packing jobs. (Tr. 313-14).  He said he considers interruptions to pick up and drop off supplies, and working in proximity to someone to be normal distractions.  (Tr. 314).  He added that if a person couldn't tolerate those distractions, they would have difficulty performing that type of work.  (Tr. 314).

6.  *Plaintiff's Testimony*

Ms. Foix testified as to her living situation, employment, daily activities, impairments and limitations at the hearing.  (Tr. 278-93).  Ms. Foix testified that she lives in a home with her six-and-a-half year old son.  (Tr. 278).  At the time of the hearing, she had a job with varying income, but less than $500 a month.  (Tr. 278).  She was working as a dietary aid with the elderly.  (Tr. 279).  She started the job about a year ago, and her job was to do food prep and deliver the food to the residents.  (Tr. 280).  She does the work with the help of her co-workers.  (Tr. 280).  They help remind her how to do things.  (Tr. 281).  Ms. Foix also testified that the work is fast-paced and when she gets tired she drops things, or trips for no reason.  (Tr. 282).

Ms. Foix then testified that she can cook, clean, do the laundry, drive, and grocery shop for herself and her son.  (Tr. 283).  She has a high school education, but

she had a lot of help in school.  (Tr. 284).

Ms. Foix also explained that she had kidney surgery when she was seven and she doesn't know how her kidneys are functioning now.  (Tr. 284-85).  She also had tendonitis in her left wrist several years ago from doing repetitive work.  (Tr. 286).  The tendonitis still comes and goes.  (Tr. 286).  She also hurt her left shoulder, but it isn't as bad as it was.  (Tr. 286-87).

The ALJ asked Ms. Foix if she has any systems to help her remember things.  (Tr. 288).  She said she uses sticky notes, a calendar, and highlighters at home.  (Tr. 288-89).  Those tools work for her about 80 percent of the time.  (Tr. 289).  At work, she had a "cheat sheet" that she used for a year.  (Tr. 289).  When she gets stressed or tired and cannot remember things, she usually relies on a co-worker.  (Tr. 290).

The ALJ asked Ms. Foix if she could do a simple repetitive job.  (Tr. 293).  She responded that she tried a repetitive job with an employer called MDI, but that is when she hurt her wrist.  (Tr. 293).  She testified that she could mentally do that type of work if there weren't a lot of distractions.  (Tr. 293).

*7.  The Legal Framework and The ALJ's Decision*

The Social Security Program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability.  42 U.S.C. § 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  Disability means that the claimant is unable to work by reason of medically determinable physical or mental impairment or impairments.  42 U.S.C. § 1382c(a)(3)(A).  The impairment must be so severe that the plaintiff not only cannot do the work he or she did before, but also cannot do any other kind of substantial gainful work.  Id.  The impairment must last for twelve months or be

17

expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations require the ALJ to apply a five-step sequential evaluation process in determining whether the claimant is disabled.  20 C.F.R. §§ 404.1520; 416.920.  The steps are: 1) is the claimant working in substantial gainful employment? 20 C.F.R. § 404.1520; 416.920; 2) does the claimant have a medically determinable impairment or combination of impairments which is severe?  20 C.F.R. §§ 404.1520(c); 416.920(4)(ii); 3) does the severe impairment or combination of severe impairments meet or equal in severity the Listing of impairments? 20 C.F.R. §§ 404.1520(d); 416.920(4)(iii); 4) given her residual functional capacity, does the claimant have the capacity to do her past relevant work?  20 C.F.R. §§ 404.1520(e); 416.920(4)(iv); 5) if the claimant cannot perform her past relevant work, does the claimant have the capacity to do other work existing in significant numbers in the national economy on a sustained, competitive level?  20 C.F.R. §§ 404.1520(f); 416.920(4)(v).  The claimant has the burden of proving the existence and severity of any functional limitations caused by her impairments, as well as the burden of proving that her impairment prevents her from performing her past relevant work.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5, (1987); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000).  If she meets that burden, the burden shifts to the Commissioner to prove there are other jobs that the claimant can perform.  Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000).

The ALJ went through the five-step evaluation process in determining whether Ms. Foix is disabled.  Plaintiff challenges the ALJ's findings at steps four and five of the evaluation process.  Thus, the Court will review the ALJ's findings at steps four and five

18

in detail.

Step four of the evaluation process requires the ALJ to determine the Plaintiff's residual functional capacity.  20 C.F.R. §§ 404.1520(d); 416.920(4)(iv).  Determination of RFC requires consideration of the evidence taken as a whole, including not only objective medical evidence, but also the subjective complaints expressed by the claimant.  Polaski v. Heckler, 739 F.2d 1320, 1321-1322 (8th Cir. 1984).  In evaluating those subjective complaints, the ALJ must consider the objective medical evidence or its absence, along with prior work record and observations by third parties and treating and examining physicians relating to such matters as:

1.  the claimant's daily activities;
2.  the duration, frequency, and intensity of pain;
3.  precipitating and aggravating factors;
4.  dosage, effectiveness, and side effects of medication;
5.  functional restrictions.

Polaski, 739 F.2d at 1322.

The ALJ found that Ms. Foix has the residual functional capacity for work that is visual and provides hands-on demonstrations, rather than oral or written instructions, with tasks that focus on manipulating tangible materials, rather than auditory and written material.  (Tr. 15.).  The claimant is able to perform a small number of brief, simple, repetitive tasks, each of which consists of a fixed sequence of steps.  (Tr. 15).  The claimant is able to work in a structured, consistent work environment with few distractions and interruptions and low stress.  (Tr. 15).  In reaching this determination, the ALJ reviewed Ms. Foix's subjective complaints.  (Tr. 16).  The ALJ noted that she alleges severe memory problems that prevent her from being successful in her employment.  (Tr. 16).  Ms. Foix stated that when she has too many tasks to do, she

19

becomes overwhelmed and cannot function.  (Tr. 16).  She also asserts that she suffers

fatigue, which causes her to trip, stumble, and drop things.  (Tr. 16).  The ALJ found

that Ms. Foix suffers medically determinable impairments that could be expected to

produce the symptoms she describes, but that her statements concerning the intensity,

persistence, and limiting effects of the symptoms are not entirely credible.  (Tr. 16).

Next, the ALJ reviewed the objective medical evidence and found it does not

support Ms. Foix's allegation of disability.  (Tr. 16).  The ALJ found that a

neuropsychological evaluation of Ms. Foix when she was fourteen years old indicated

that she was in the low to mid-average range of intellectual functioning.  (Tr. 16).  While

the test results indicated a pattern of inconsistent attention and concentration, the ALJ

noted that Ms. Foix scored in the average to low average range in the Free from

Distractibility Index and Processing Speed Index.  (Tr. 16).  She showed a normal ability

to repeat seven digits forward and five backwards.  (Tr. 16).  Her academic scores were

in the average range.  (Tr. 16).  The ALJ concluded that these reports indicate Ms. Foix

functions at a higher level than her subjective complaints suggest.  (Tr. 16.)

The ALJ also considered Ms. Foix's neuropsychological testing in August 2004.

(Tr. 16).  Her mood was normal and concentration and memory appeared adequate.

(Tr. 16).  She achieved a 103 full scale score on the Wechsler Adult Intelligence Scale,

indicating average intellectual ability.  (Tr. 17).  Her scores on the Wechsler Memory

Scale were in the low average to borderline range, with significantly lower auditory

immediate memory.  (Tr. 17).  The ALJ noted that Ms. Foix was highly distractible, even

in the low distraction setting of the neuropsychological testing.  (Tr. 17).

The ALJ noted that Ms. Foix went to the Polinsky Neurorehabilitation Center from

April 2005 through August 2005 for treatment.  (Tr. 17).  In treatment, she increased her communication ability and met her goal of applying adaptive coping tools in daily life. (Tr. 17).

The ALJ reviewed the opinion of Dr. Steven Carter, the medical expert.  (Tr. 17). The ALJ stated that he granted significant weight to Dr. Carter's opinion because Dr. Carter was in the best position to accurately assess Ms. Foix's limitations through his review of the longitudinal record.  (Tr. 17).  Thus, the ALJ found that Ms. Foix experiences no restrictions on her activities of daily living, no difficulties in social functioning, and only mild difficulties in maintaining concentration, persistence, and pace, but that her difficulties in maintaining concentration, persistence, and pace become marked if she has to multi-task or work in a highly distractible environment.  (Tr. 18).  The ALJ specifically noted that Ms. Foix's testing indicates that her memory is in the low range of average, and is not severely impaired.  Her scores on processing speed and distractibility were in the average range.  He concluded that the discrepancy between Ms. Foix's subjective complaints and the objective evidence of record reduces her overall credibility.  (Tr. 18).

The ALJ then considered Ms. Foix's course of treatment and found it to be inconsistent with her assertion of disability.  The ALJ noted that Ms. Foix was treated at the Polinsky Neurorehabilitation Center and was able to meet her treatment goals.  (Tr. 18).  She had not otherwise received any treatment for coping strategies to deal with her difficulties with memory.  (Tr. 18).  The ALJ found that this limited treatment indicates that Ms. Foix's impairment is not as severe as she asserts.  (Tr. 18).

The ALJ considered Ms. Foix's reported activities of daily living and found it to be

inconsistent with her assertion of disability.  (Tr. 18).  He noted that Ms. Foix lives

independently in a house with her son, cares for her child and her pet, does housework,

spends time with friends, and drives a car.  (Tr. 18).  He also noted that she scored

quite high on a test taken in a course on hunter's safety because the learning was

visual.  (Tr. 18).  The ALJ acknowledged that Ms. Foix is unable to learn or memorize

lists of activities.  (Tr. 18).  However, he found her relatively active lifestyle indicates that

her impairment is not as severe as she suggests.  (Tr. 19).

The ALJ considered Ms. Foix's work history.  (Tr. 19).  He noted that Ms. Foix

has consistently worked on a part-time basis.  (Tr. 19).  The ALJ commented, "...she

has not attempted work given the limitations set forth in her residual functional

capacity."  (Tr. 19).

Finally, the ALJ considered the various medical opinions in the record.  He noted

that Dr. Carter's expert testimony was consistent with the opinion of the State Agency

non-examining psychologist, Dr. Conroe.  (Tr. 19).  The ALJ placed significant weight on

Dr. Carter's and Dr. Conroe's opinions because they had a longitudinal knowledge of

her impairments, based on review of the record.  (Tr. 19).

The ALJ stated that he considered the opinion of Dr. Murrey, a

neuropsychologist.  (Tr. 19).  The ALJ summarized Dr. Murrey's opinion as follows.  Ms

Foix is able to understand instructions, although she may have difficulty with her

memory.  (Tr. 19).  When she is able to maintain attention and focus, she is able to

carry out work-like tasks with reasonable persistence and pace.  (Tr. 19).  She is

capable of tolerating the type of stress found in normal entry-level work, but with

increased stress, her memory will decrease.  (Tr. 19).

The ALJ noted that Ms. Foix treated with a licensed psychologist, Mary McHardy, who opined that Ms. Foix is able to work within a daily structure and routine that provides ample time to learn and process new procedures.  (Tr. 19).  Ms. McHardy opined that Ms. Foix should be allowed adequate rest breaks, and that she can work in an environment where she works one task at a time with minimal distractions.  (Tr. 19). The ALJ concluded that he placed significant weight on Dr. Murrey's and Ms. McHardy's opinions because they are her treating psychologists; therefore, he incorporated the above-described restrictions into Ms. Foix's residual functional capacity. (Tr. 19).

The ALJ did not place significant weight on the opinion of Ms. Foix's treating physician, Dr. Mark Wagner.  (Tr. 19).  Dr. Wagner opined that Ms. Foix can perform simple tasks with low complexity and low stressors, and should be limited to twenty hours work per week.  (Tr. 19).  The ALJ found that Dr. Wagner's opinion is inconsistent with the objective medical evidence because there is no indication from neuropsychological testing that Ms. Foix is unable to sustain persistence and pace for full time work, given that the restrictions of her residual functional capacity are met.  (Tr. 20).  The ALJ found the opinion concerning the limitation to a twenty-hour work week to be solely based on subjective complaints of fatigue and declined to give it significant weight.  (Tr. 20).  Thus, he gave significant weight to the opinions of Dr. Carter, Dr. Conroe, Dr. Murrey, and psychologist Mary McHardy in determining Ms. Foix's residual functional capacity.

The ALJ noted that Ms. Foix does not have any past relevant work; therefore, he continued to the fifth step of the evaluation process.  (Tr. 20).  At step five, the ALJ considered Ms. Foix's residual functional capacity, age, education, and work experience

23

in conjunction with the Medical-Vocational Guidelines.  (Tr. 20).  See 20 C.F.R. §§ 404.1560(c); 404.1566; 416.960(c); 416.966; Part 404, Subpart P, Appendix 2.  The ALJ relied on the testimony of the vocational expert, Edward Utities, that a person with Ms. Foix's impairments and limitations could perform the requirements of occupations such as wrapping and packaging, with 8,000 such jobs in Minnesota.  (Tr. 20-21).  The ALJ concluded that Mr. Utities' testimony was consistent with the Dictionary of Occupational Titles.  (Tr. 21).  Therefore, he found Ms. Foix not disabled.

### III.  STANDARD OF REVIEW

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), authorizes judicial review of the Commissioner's final decision.  When the Appeals Council denies review, the ALJ's decision stands as the final decision of the Commissioner.  20 C.F.R. §§ 404.981; 416.1481.  The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Thus, judicial review is limited to determining whether substantial evidence supported the ALJ's findings and whether the ALJ applied the correct legal standards in reaching his or her decision.  See Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).

Substantial evidence is more than a "mere scintilla" of evidence, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The reviewing court does not try cases de novo, reweigh the evidence or decide questions of credibility.  See Naber v. Shalala, 22 F.3d 186, 188 (8th Cir. 1994).  If substantial

24

evidence supports the ALJ's decision, it must be affirmed; the decision may not be reversed simply because substantial evidence might also support a different conclusion. See Prosch v. Apfel, 201 F.3d 1010, 1012, (8th Cir. 2000).  The ALJ's findings must be upheld if they are supported by substantial evidence in the record as a whole.  Miller v. Sullivan, 953 F.2d 417, 420 (8th Cir. 1992); Cline v. Sullivan, 939 F.2d 560, 564 (8th Cir. 1991).

The Court must do more than examine the record for substantial evidence. Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).  The analysis conducted by the court must include evidence which detracts from the weight of the evidence supporting the ALJ's decision.  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The court must consider the weight of the evidence and apply a balancing test to evidence which is contrary.  Id.  The court is required to review the administrative record as a whole and consider:

1. the credibility findings made by the ALJ;
2. the plaintiff's vocational factors;
3. the medical evidence provided by treating and consulting physicians;
4. the plaintiff's subjective complaints relating to exertional and nonexertional activities and impairments;
5. any corroboration by third parties of plaintiff's impairments; and
6. the testimony of vocational experts when required, which is based upon a proper hypothetical question, which sets forth the claimant's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).  In reviewing the record, the court may not substitute its own judgment or findings of facts.  Woolf v. Shalala, 3 F.3d 1210, 1213

(8th Cir. 1993).

## IV.  CONCLUSIONS OF LAW

The issue in the present case is whether the Commissioner met his burden of proof that Ms. Foix can perform work which exists in significant numbers in the economy.[1]  This, in turn, also requires the Court to determine whether there is substantial evidence in the record to support the ALJ's determination of Ms. Foix's residual functional capacity.

1.      *The record does not support the ALJ's determination of Plaintiff's residual functional capacity.*

The record is, at best, confusing regarding which treating sources the ALJ credited, and which he didn't, in making a determination about Plaintiff's residual functional capacity.

The Regulations state that, "[r]egardless of its source, we will evaluate every medical opinion we receive, unless we give a treating source's opinion controlling weight under paragraph d(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion."  20 C.F.R. §§ 404.1527(d); 416.927(d).  The factors include examining relationship, treatment relationship, length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and any other factors

---

[1]  Plaintiff states, "Foix does not dispute the findings of ALJ Thomas regarding the first four steps of the sequential evaluation."  (Plaintiff's Memorandum, p. 9, Docket No. 9).  However, Plaintiff contends the ALJ failed to define her residual functional capacity consistent with the opinions of her treating mental health professionals, Dr. Murrey, and Mary McHardy.  (Plaintiff's Memorandum, p. 10, 12).  Therefore, it appears that Plaintiff disputes the ALJ's determination of her residual functional capacity at step four of the evaluation, and her statement to the contrary was in error.

that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d)(1), (2);

416.927(d)(1), (2).  This evaluation also applies to State agency medical or

psychological consultants or other program physicians or psychologists.  20 C.F.R. §§

404.1527(f)(2)(ii); 416.927(f)(2)(ii).

> Unless the treating source's opinion is given controlling
> weight, the administrative law judge must explain in the
> decision the weight given to the opinions of a State agency
> medical or psychological consultant or other program
> physician or psychologist, as the administrative law judge
> must do for any opinions from treating sources, nontreating
> sources, and other nonexamining sources who do not work
> for us.

Id.

Under the regulations, a treating physician's opinion will be granted controlling

weight if it is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in the record.  20

C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).   "The regulations require that the ALJ 'always

give good reasons' for the weight afforded to a treating physician's evaluation."  Reed v.

Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2); Dolph

v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002).   Even though a treating physician's

opinion is normally entitled to substantial weight, it does not automatically control

because the hearing examiner must evaluate the record as a whole.  Wagner v. Astrue,

499 F.3d 842, 849 (8th Cir. 2007).  "When one-time consultants dispute a treating

physician's opinion, the ALJ must resolve the conflict between those opinions."  Id.

(quoting Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000)).

It is important to identify the treating, consulting, and non-examining

psychologists' opinions.  Ms. Foix alleges a disabling impairment of cognitive

dysfunction related to a traumatic brain injury.  Jeff Tonnstra is a one-time consulting

licensed psychologist hired by the Social Security Disability Determination Service to

evaluate Ms. Foix's impairments.  He opined:

> Ms. Foix appears to have the mental capacity to understand
> but has difficulty remembering or following instructions.  Has
> difficulty with distractibility, which affects her attention and
> concentration.  When able to maintain attention and focus is
> able to carry on work like task with reasonable persistence
> and pace.  Appears to reasonably respond to brief and
> superficial contact with co-workers and supervisors.  She
> appears capable of tolerating stress and pressure found in
> typical entry level work places however if her stress level
> increases it is likely that she would increase her problem with
> her memory functioning.  It is recommended that the
> previous recommendations from the neuropsychological
> evaluation completed when she was age 14[2] be followed in
> terms of helping her maintain an environment that reduces
> the chance of distraction and related memory difficulties
> occurring.

(Tr. 180).

Dr. Gregory Murrey is a neuropsychologist at Polinsky Medical Center who

performed one evaluation of Ms. Foix's impairments.  (Tr. 186-190).  Based on his

evaluation he opined that Ms. Foix has select weaknesses in certain areas of memory

that would likely have an effect on her functioning in a work environment, and she has a

---

[2]  The recommendations by Dr. Wolfe, based on the evaluation of Ms. Foix when she was
fourteen years old, are that she would perform the best in settings where she is actively involved
in experiential learning, with the opportunity to manipulate learning materials.  (Tr. 153).  She
would have difficulty attending to verbally presented material, recalling verbal material, and
integrating previously learned information in novel ways.  (Tr. 153).  She would perform better
if distractions were reduced.  (Tr. 153).  Her difficulty in organizing and structuring problem-
solving strategies could be reduced by modeling tasks to be performed, allowing practice under
supervision, and teaching generalization from one task to another.  (Tr. 153-54).

reduced ability to handle high stress situations and is at risk of mood disorder.  (Tr. 227).

Although he says in his decision, that he granted significant weight to Dr. Murrey's opinion, in describing that opinion, the ALJ quotes from Mr. Tonnstra's (one time consulting psychologist hired by SSA) opinion.  (Tr. 19; Exhibit 3F).  Assuming (without deciding) as does the Government, that the ALJ intended to grant significant weight to Jeff Tonnstra's opinion, the ALJ did not discuss how much, if any, weight he gave to Dr. Murrey's actual opinion.  (Tr. 19).

Mary McHardy, a licensed psychologist, saw Ms. Foix for an initial neurorehabilitation interview, followed by eight treatment sessions.  (Tr. 220).  Ms. McHardy is the only psychologist who had a treating relationship with Ms. Foix.  She opined in narrative form:

> Ms. Foix has difficulty in experiencing changing from her routine.  Particular challenges include multi-tasking, shifted attention, distractibility, and organization, sequencing.  How others communicate with her is also essential, with helpful feedback more conducive versus a critical manner of feedback.  Fatigue is also a variable, with decreased coordination the result.  When Ms. Foix is over stressed or has too much to do, her tolerance is lowered, and she may become physically ill.  She does need to ensure that she has adequate rest breaks, and that physically she pace herself comfortably.  Regarding specific work tasks, when setting tables, she may confuse the order of things, or when persons that she is serving change food orders, she will have memory difficulties.  Additional challenges include remembering items that she needs to follow through on the next day.  When having to do a lot of job tasks at one time, she is more likely to make mistakes.  When staff or residents interrupt her, she is more likely to forget information that she is needing to process or recall.  Doing unfamiliar/new tasks can result in confusion, with Ms. Foix doing best in reverting to her old way of doing things.  She does need more time

> and does experience difficulty when having to learn things
> that are new or novel.

(Tr. 217).  Ms. McHardy listed five adaptive strategies that should be in place for Ms.

Foix to do her best in a work environment:

> 1. needs daily structure and routine, with ample time to
>    learn and process new procedures;
> 2. needs things written down, preferably a checklist with all tasks in
>    sequence;
> 3. needs extra time to complete tasks, without extra tasks being added.
> 4. "[f]atigue is a huge area of challenge for persons with brain injury."  Ms.
>    Foix needs adequate rest breaks;
> 5. "persons with brain injury have trouble multi-tasking" needs to do one
>     task at a time, minimizing distractions, and not shifting
>     attention between various activities.

(Tr. 216).  Ms. McHardy also completed a checklist form, which indicates Ms. Foix has

poor to no ability to engage in a series of work-related activities.  (Tr. 218-19).

        The ALJ gave significant weight to Ms. McHardy's opinion that Ms. Foix is able to

work within a daily structure and routine that provides ample time to learn and process

new procedures, allows adequate rest breaks, and can work one task at a time with

minimal distractions, but did not address Ms. McHardy's opinions of Ms. Foix's abilities

as found in the "Medical Opinion Re: Ability to Do Work-Related Activities (Mental)"

form.  (Tr. 218-19).  The ALJ stated that he granted Ms. McHardy's opinion significant

weight because, as a treating psychologist, she has personal knowledge of Ms. Foix's

impairments, which enabled her to accurately assess her limitations.  (Tr. 19).

However, he did not explain why her opinion, as the only treating psychologist, is not

entitled to controlling weight or why the information in the medical opinion form should

not be considered as part of her opinion regarding Ms. Foix's abilities and limitations.

Furthermore, the ALJ did not incorporate Ms. Foix's need for adequate rest breaks into

the hypothetical question posed to the vocational expert, although he explicitly stated

that he granted such opinion significant weight.

The ALJ also said he granted significant weight to the opinions of Drs. Carter and

Conroe[3] because they had the opportunity to review the medical record, providing them

with a longitudinal knowledge of Ms. Foix's impairments, and placing them in a good

position to accurately assess her limitations.  (Tr. 19).  In fact, the ALJ appears to have

granted Dr. Carter's opinion controlling weight, as he nearly verbatim adopted it as Ms.

Foix's residual functional capacity.  See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir.

2000) ("the opinion of a consulting physician who examines a claimant once, or not at

all, does not generally constitute substantial evidence.") (quoting Kelley v. Callahan, 133

F.3d 583, 589 (8th Cir. 1998)).

In summary, the ALJ failed to explain what, if any weight he accorded to Dr.

Murrey's actual opinion and failed to explain why he did not grant controlling weight to

the Plaintiff's treating psychologist's opinion.  This last point is most significant because,

as discussed more fully below, the vocational expert testified that a person with the

limitations and abilities described in the checklist evaluation completed by Ms. McHardy

would not be competitively employable.  (Tr. 312).  The ALJ never stated that the

treating psychologist's opinion is inconsistent with the consulting and examining

psychologists' opinions.  If the treating physician's opinion is not inconsistent with other

substantial evidence in the record, and is based on medically acceptable clinical and

---

[3] Dr. Carter is a medical expert, who did not examine or treat the Plaintiff.  He reviewed the file and offered his medical opinions based upon what he read in the file.  (Tr. 294-305). Dr. Conroe is a state agency psychologist who reviewed the record and completed a PTRF and RFC assessment.  (Tr. 191-95, 202-12).

laboratory diagnostic techniques, the ALJ erred by not granting it controlling weight.  20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2); <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1014 (8th Cir. 2000).  If a treating physician's opinion is not entitled to controlling weight, the ALJ must explain why he granted greater weight to the opinions of one-time consulting and non-examining psychologists.  <u>Id</u>. at 1013.  Remand is required for the ALJ to weigh Ms. McHardy's opinions in their entirety, to determine whether Ms. McHardy's opinion contained in a "Medical Opinion Re: Ability to Do Work-Related Activities (Mental)" form (Tr. 218-19) is entitled to controlling weight, and if not, to provide good reasons for the weight accorded to the opinions of treating, consulting, and examining sources.

2.    *The failure to adequately and accurately describe the weight the ALJ accorded to the various sources, tainted the question he posed to the VE.*

The ALJ claimed to have accorded significant weight to the opinions of Dr. Greg Murrey, and psychologist Mary McHardy, but the ALJ failed to obtain vocational expert testimony based on those opinions.  The confusion over whether it was Dr. Murrey's opinion or Mr. Tonnstra's opinion to which the ALJ granted "significant weight," was exacerbated by the questions posed to the vocational expert.  Using Dr. Murrey's actual opinion as described in Exhibit 11F, (Tr. 310, 227), the VE did not identify any jobs such a person could perform because he found the opinion to be difficult to interpret.  (Tr. 310).

More importantly, when the VE considered Ms. McHardy's residual functional capacity opinion in Exhibit 9F, (Tr. 216-21) he testified that such a person would not be competitively employable, and yet, the ALJ found that there are occupations Ms. Foix can perform.  (Tr. 311-12).  Defendant contends that the ALJ only incorporated some of

psychologist Mary McHardy's opinions concerning Ms. Foix's residual functional

capacity into his RFC determination, and that the ALJ incorporated those limitations into

the hypothetical question posed to the VE.  Although this appears be true, as discussed

above, the ALJ did not provide any reasons for rejecting significant portions of Ms.

McHardy's opinion.  Indeed, he fails to even acknowledge that he was doing so.

The hypothetical question posed to the VE by the ALJ, and ultimately relied on in

making his disability determination, appears to match Dr. Carter's description of Ms.

Foix's limitations.  (Tr. 301, 307).  The ALJ stated that he granted significant weight to

Dr. Carter's opinion, but as discussed above, failed to explain why he granted Dr.

Carter's opinion more weight than he did to Ms. McHardy's opinion.  Indeed, in posing

his hypothetical question to the vocational expert, (Tr. 19) the ALJ appears to have

included, without explanation, only the parts of Dr. Murrey's and Ms. McHardy's

opinions that were consistent with Dr. Carter's opinion.[4]

## V.  RECOMMENDATION

For the foregoing reasons, it is hereby recommended that:

1.  Plaintiff's Motion for Summary Judgment be granted in part [Docket No. 8];

2.  The decision of the Commissioner be reversed and the case be remanded to
the Commissioner pursuant to Sentence 4 of Section 405(g) for further
proceedings consistent with this opinion.  In particular, the ALJ must:
a) Clarify which opinions he is crediting in formulating
the hypothetical question to the vocational expert;

b) To the extent the ALJ credits only parts but not all of
a source's opinion because parts are inconsistent
with other opinions he credits, or otherwise, the ALJ

---

[4] Neither party challenges the ALJ's decision (Tr. 19) not to grant significant weight to
the opinion of Ms. Foix's treating physician, Dr. Mark Wagner.

must articulate the inconsistency and explain why he
rejects those portions he does not credit;

c) To the extent the ALJ continues to not give the
entirety of Ms. McHardy's opinion controlling weight,
the ALJ must explain why and more fully explain why
he gave more weight to the consulting opinions than
to Plaintiff's treating sources.

3.  Defendant's Motion for Summary Judgment be denied [Docket No. 11].


DATED: May 15, 2008                         s/ *Franklin L. Noel*
                                            FRANKLIN L. NOEL
                                            United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation
by filing with the Clerk of Court and serving on all parties, on or before **June 4, 2008,**
written objections which specifically identify the portions of the proposed findings or
recommendations to which objection is being made, and a brief in support thereof.  A
party may respond to the objecting party's brief within ten days after service thereof.  All
briefs filed under the rules shall be limited to 3500 words.  A judge shall made a de novo
determination of those portions to which objection is made.  This Report and
Recommendation does not constitute an order or judgment of the District Court, and it
is, therefore, not appealable to the Circuit Court of Appeals.